**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> THE NEW YORK TIMES COMPANY, <br><br> Defendant. | CIVIL ACTION NO. <br><br> **COMPLAINT** <br><br> JURY TRIAL DEMAND |

## NATURE OF THE ACTION

This is an action under Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991, to correct unlawful employment practices on the basis of race and/or sex and to provide appropriate relief to the Charging Party.[1] As alleged with greater particularity below, Plaintiff, United States Equal Employment Opportunity Commission, alleges that Defendant, The New York Times Company ("NYT" or "Defendant"), failed to promote Charging Party because of his race (White) and/or sex (male).

## JURISDICTION AND VENUE

1.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345. This action is authorized and instituted pursuant to Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.§ 2000e-5(f)(1) and (3) ("Title VII") and pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2.      The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the Southern District of New York.

---

[1] The identity of the Charging Party is known to the Defendant.

**PARTIES**

3.      Plaintiff, the Equal Employment Opportunity Commission ("EEOC" or "Commission"), is the agency of the United States of America charged with the administration, interpretation, and enforcement of Title VII and is expressly authorized to bring this action by Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. § 2000e-5(f)(1) and (3).

4.      At all relevant times, The New York Times Company ("NYT" or "Defendant"), has been a New York corporation continuously doing business in the State of New York and the City of New York, and has continuously had at least 15 employees.

5.      At all relevant times, NYT has continuously been an employer engaged in an industry affecting commerce under Sections 701(b), (g), and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g), and (h).

6.      At all relevant times, NYT has been a covered entity under Section 701(b) of Title VII, 42 U.S.C. § 2000e(b).

**ADMINISTRATIVE PROCEDURES**

7.      More than thirty days prior to the institution of this lawsuit, the Charging Party filed a charge (charge number 520-2025-06545) with the Commission alleging violations of Title VII by Defendant.

8.      The Commission issued Defendant a Letter of Determination finding reasonable cause to believe that Defendant violated Title VII.

9.      The Commission invited Defendant to join with the Commission in informal methods of conciliation to endeavor to eliminate the unlawful employment practices and provide appropriate relief.

10.    The Commission engaged in communications with NYT to provide Defendant the opportunity to remedy the discriminatory practices described in the Letter of Determination.

11.    The Commission was unable to secure from Defendant a conciliation agreement acceptable to the Commission.

12.    The Commission issued to Defendant a Notice of Failure of Conciliation.

13.    All conditions precedent to the institution of this lawsuit have been fulfilled.

<u>**STATEMENT OF CLAIMS**</u>

14.    Since at least October 2024, Defendant has engaged in unlawful employment practices in New York, New York, in violation of Section 703 of Title VII, 42 U.S.C. § 2000e-2(a)(1).

15.    Defendant discriminated against Charging Party by failing to promote him based on his race and/or sex, in violation of Section 703 of Title VII, 42 U.S.C. § 2000e-2(a)(1).

**NYT Implements Race and Sex-Based Leadership Representation Goals**

16.    As a global media organization, NYT is a news publisher with nearly twelve million subscribers to its print and digital products.

17.    Since at least 2017, NYT has published annual "Diversity and Inclusion Reports" showing the demographic composition of its staff, leadership, and new hires by sex and race with charts, graphs, and multi-year trends.

18.    These reports emphasized the NYT's goal of increasing representation of Black and Latino workers as well as female workers.

19.    In these reports, NYT announced it had taken actions toward increasing representation of Black and Latino workers and female workers. Among the actions it announced were:

a.  Sharing robust diversity goals for its newsroom;

b.  Codifying and tracking diversity goals of the newsroom departments;

c.  Creating a Culture & Careers Department to play a central role in advancing diversity, equity, and inclusion priorities newsroom-wide;

d.  Strengthening systems and processes to help attract and retain leaders from diverse backgrounds;

e.  Sharing data and insights internally, so managers know where their teams stand and can be held accountable for progress in terms of diversity;

f.  Encouraging leaders at all levels to be intentional about how they can foster diversity and inclusion;

g.  Reviewing promotion and retention data at least quarterly by company leadership; and

h.  Requiring a "diverse" slate of qualified candidates for every open role, and a "diverse" panel of interviewers.

20.    In February 2021, NYT published "A Call to Action," which it called a "bold plan for building a more diverse, equitable and inclusive New York Times."

21.    In "A Call to Action," NYT stated that "people of color—and particularly women of color—remain notably underrepresented in its leadership."

22.    In its 2022, 2023, and 2024 "Diversity and Inclusion Reports," NYT defined "people of color" as "all ethnicities excluding white and unspecified."

23.    The 2022 "Diversity and Inclusion Report" shared the NYT's "2022 data and a progress update on our Call to Action."

4

24.    The 2023 and 2024 "Diversity and Inclusion" reports likewise provided updates to the public on the NYT's "progress" on its "Call to Action."

25.    As part of the "Call to Action," NYT set a goal of increasing the number of Black and Latino employees in leadership by 50 percent by 2025.

26.    The "Call to Action" set forth actions for the NYT to undertake, including the following:

   a. Explicitly tying diversity, equity and inclusion to NYT's stated values;

   b. Adding new employees in the recruiting team to focus on outreach and building candidate pipelines among "people of color" and other "underrepresented groups";

   c. Ensuring that clearly defined "diversity, equity and inclusion" expectations are woven into all leaders' assessment and compensation; and

   d. Judging senior leaders by how well they "create pathways" for a "diverse" group of deputies to succeed them.

27.    In the 2021 "Call to Action," NYT stated, among other things, "[t]hese efforts have led to significant progress in diversifying the company. Last year, 48 percent of new hires were people of color. Since 2015, we have increased the overall percentage of people of color at the company from 27 percent to 34 percent; and we have increased the percentage of people of color in leadership from 17 percent to 23 percent. We have also increased the percentage of women at the company from 45 percent to 52 percent; and we have increased the percentage of women in company leadership from 40 percent to 52 percent."

28.    The next sentence in the "Call to Action" stated, "Yet this progress has been incomplete."

29.     Accordingly, the "Call to Action" and the "Diversity and Inclusion Reports" detailed NYT's express efforts to make employment decisions on the basis of race and sex to achieve its desired demographic goals.

30.     A decrease in the percentage of White male employees (whether new hires, existing employees, or those in leadership, as appropriate) was a necessary consequence for the NYT to achieve these results.

31.     Similarly, the "Call to Action" and the "Diversity and Inclusion Reports" detailed NYT's express efforts to hold its leadership accountable in their performance assessments and compensation for making employment decisions on the basis of race and sex to achieve its desired demographic goals.

32.     The 2022 "Diversity and Inclusion Report" also includes a summary of the NYT's plan to further change the demographics of its staff and specifically its leadership ranks.

33.     It specifies a goal to "increase the representation of Black and Latino colleagues in leadership by 50% by 2025." The 2022 Report indicates that NYT met this goal in 2022, three years ahead of schedule.

34.     In 2022 when the NYT indicated it met the goal of increasing Black and Latino colleagues in leadership by 50%, there was no directive given to employees to cease the affirmative actions outlined in the Call to Action.

6

35.     In its 2024 "Diversity and Inclusion" report, NYT featured graphs detailing the results of its efforts to achieve its desired demographics across its staff:



[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]





36.     The above graphs show the NYT used the term "people of color" to encompass Asian, Black, Hispanic or Latino, Multiracial, Native Hawaiian or Pacific Islander, and Native American employees. It excluded White employees.

37.    In May 2024, Deputy Managing Editor, Monica Drake, and Assistant Managing Editor for Strategy Operations and Finance, Jonathan Galinsky, discussed on Slack an internally circulated "Human Capital Report" reflecting the data to be represented in the 2024 "Diversity and Inclusion Report":

a.    Galinsky described the trend as "alarming."

b.    Galinsky suggested that Executive Editor, Joseph Kahn, "make some targeted efforts to have folks reset on this front—that wouldn't be a good narrative for him."

c.    According to Galinsky, the "narrative" that "wouldn't be . . . good" for Executive Editor Kahn was that "NYT starts focusing on independence / clamps down on dissent and stops hiring people of color . . ."

d.    Drake agreed the trends were not good and stated, "I think we need to talk to department heads about it."

e.    Drake and Galinsky agreed on the importance of continuing "progress" on the leadership representation goal.

38.    The May 2024 conversation between Drake and Galinsky, who were senior editors, shows that NYT top leadership discussed "targeted efforts" and were "alarmed" about the trends in the percentage of Whites in leadership reflected in that data, and shows NYT intended to act to increase the numbers of non-White leaders.

39.    A necessary consequence of NYT's intent to increase the percentage of non-White leaders would be a decrease in the percentage of White leaders.

40.     Particularly, decreasing the percentage of White males in leadership would contribute to the NYT's dual goals of increasing the percentages of females and "people of color" (as defined by NYT) in leadership.

**NYT Passes Over A Significantly More Qualified White Male For A Promotion To A Deputy Real Estate Editor Leadership Position For A Less Qualified Candidate That Satisfied NYT's Diversity Goals**

41.     In its Diversity and Inclusion Reports from 2017 to 2024, NYT defined "leadership positions" in the newsroom as deputy editor positions and above.

42.     In October 2024, NYT posted a job opening for a Deputy Real Estate Editor position.

43.     The Deputy Real Estate Editor was a leadership position in the NYT as defined in NYT's Diversity and Inclusion Reports from 2017 to 2024.

44.     The hiring manager for the position was Real Estate Editor Nikita Stewart.

45.     Stewart worked with Senior Talent Acquisition Manager Soraya Gunnell to fill the position of Deputy Real Estate Editor.

46.     Diversity, equity, and inclusion activities were part of Stewart's performance review in 2024.

47.     Stewart spoke at two or more seminars on diversity, equity, and inclusion where she was introduced using her NYT title.

48.     In her 2024 performance review, Stewart provided a self-review of her contributions that included serving as co-chair of the employment resource group, Black@NYT, and counseling Black journalists to help them rise in their careers.

49.     Diversity, equity, and inclusion activities were part of Gunnell's performance review in 2024.

50. In her 2024 performance review, Gunnell provided a self-review of her contributions that included attending a conference of the National Association of Black Journalists (NABJ); talking to individuals there as part of her recruitment efforts; and being invited to speak to a team within NYT about diversity, equity, and inclusion recruiting efforts and practices in early 2025.

51. No one was hired from the October 2024 Deputy Real Estate Editor job posting, and NYT reposted the job opening for a Deputy Real Estate Editor position in January 2025.

52. The job description of the Deputy Real Estate Editor position stated a "basic qualification" for experience with stories about real estate development, the housing market, as well as décor, design and architecture.

53. In a public job posting for the Deputy Real Estate Editor position, "experience with stories about real estate development, the housing market, as well as décor, design and architecture" was listed as a "Requirement" for the position.

54. The term "basic qualification" was therefore used interchangeably with the term "requirement" in NYT's postings for the position.

55. Charging Party applied for the Deputy Real Estate Editor position from the January 2025 job posting.

56. NYT was aware of Charging Party's protected characteristics of race (White) and sex (male).

57. Charging Party had worked for NYT as an editor since 2014.

58. Charging Party had been Senior Staff Editor on NYT's International Desk for more than nine years and held this role at the time he applied to the Deputy Real Estate Editor position.

59.     Charging Party previously had worked for two years as an editor on NYT's Business Desk, where he edited and produced stories focusing on real estate and other subjects.

60.     Before NYT, Charging Party worked as Director of Content and Programming for Events at The Economist, Editorial Director and Director of Digital Innovation at ALM Media, Editorial Director of Digital Media at McGraw Hill Companies, Inc., Editor-in-Chief of Multi-Housing News at Nielsen Company, and Executive Editor of Commercial Property News at Nielsen Company.

61.     Charging Party had considerable experience with real estate news, multiple news platforms, and innovative content.

62.     Charging Party had considerable experience managing staff, correspondents, and freelancers.

63.     Charging Party met all requirements for the Deputy Real Estate Editor position, including experience with real estate journalism.

64.     Charging Party was qualified for the position of Deputy Real Estate Editor.

65.     In addition to his real estate news experience, Charging Party's cover letter and resume showed his experience and abilities in innovative storytelling and different journalism formats.

66.     Charging Party had received over twenty-five digital journalism awards at the time he applied, and he referenced those awards on the resume he submitted.

67.     When Charging Party and Stewart met for a screening interview regarding the job opening, Stewart primarily asked him about his journalism experience with affordable housing.

68.     During her interview, Stewart never asked Charging Party questions about the topics of innovative storytelling or different journalism formats.

69.     Stewart informed Charging Party he would be asked to provide his vision for the real estate desk in writing, but he never received such a request.

70.     As a White male, Charging Party did not match the race and/or sex characteristics NYT sought to increase in its leadership through its diversity actions and aspirations.

71.     NYT did not select Charging Party for the Deputy Real Estate Editor position, and he was not among the candidates given a final panel interview for the position.

72.     Stewart was a decision-maker who selected the final candidates to receive a panel interview for the Deputy Real Estate Editor position.

73.     Gunnell was a decision-maker who selected the final candidates to receive a panel interview for the Deputy Real Estate Editor position.

74.     As reflected in Stewart's self-reviews, Stewart understood that the company expected and encouraged her to advance the race and sex-based goals stated in the "Call to Action."

75.     As reflected in Gunnell's self-reviews, Gunnell understood that the company expected and encouraged her to advance the race and sex-based goals stated in the "Call to Action."

76.     Stewart was influenced by NYT's stated race and sex-based hiring and promotion goals in the selection of final candidates for the Deputy Real Estate Editor position.

77.     Gunnell was influenced by NYT's stated race and sex-based hiring and promotion goals in the selection of final candidates for the Deputy Real Estate Editor position.

78.     NYT's desire to increase the percentage of non-White or female candidates in leadership positions influenced the selection of final candidates for the Deputy Real Estate Editor position.

79.     None of the final candidates for the Deputy Real Estate Editor position were White males.

80.    The four candidates advanced to the panel interview stage matched the race and/or sex characteristics NYT sought to increase in its leadership.

81.    Specifically, the final pool of candidates was composed of a White female, a Black male, an Asian female, and a multiracial female.

82.    Charging Party did not match the race and/or sex characteristics NYT sought to increase in its leadership.

83.    Charging Party did not match the race and/or sex characteristics identified for increased "representation" in the "Call to Action."

84.    The multiracial female candidate NYT advanced to the panel interview stage was selected for the Deputy Real Estate Editor position.

85.    As a multiracial female, this candidate matched the race and/or sex characteristics NYT sought to increase in its leadership.

86.    The selected candidate matched the characteristics identified in the "Call to Action," which stated that "people of color—and particularly women of color—remain notably underrepresented in its leadership."

87.    At the time she applied for the Deputy Real Estate Editor position, this candidate did not have experience with real estate journalism.

88.    The selected candidate was not qualified for the Deputy Real Estate Editor position because her experience did not meet all its stated basic requirements, including the job description's stated requirement for experience with real estate journalism.

89.    Stewart deviated from normal hiring protocol to hire this particular candidate.

90.    Ordinarily, Gunnell would conduct the initial screening interview and only then would Stewart interview those selected for an interview. But with this candidate – and only this

14

candidate – Stewart preemptively emailed herself "[selected candidate] – yes" the day before Gunnell interviewed her.

91.    At the final panel interview stage, the selected candidate was among the two lowest rated candidates out of the final four candidates.

92.    One final panel interviewer ranked her tied for lowest of the four candidates, describing her as "a bit green overall" and remarked, "I don't see her contributing to the expansion of the coverage in a significant way."

93.    Charging Party was more qualified than the multiracial female candidate selected for the Deputy Real Estate Editor position.

94.    NYT's stated race and sex-based representation goals influenced the decision not to advance Charging Party to the panel interview stage of the Deputy Real Estate Editor selection process.

95.    Charging Party's race (White) and/or his sex (male) factored into NYT's decision not to advance him to the final interview panel

96.    The selected candidate's race (multiracial) and/or her sex (female) factored into NYT's decision to advance her to the final interview panel.

97.    The selected candidate's race (multiracial) and/or her sex (female) factored into NYT's decision to select her for the Deputy Real Estate Editor position.

98.    Charging Party's race (White) and/or his sex (male) factored into NYT's decision not to select him for the Deputy Real Estate Editor position.

99.    NYT failed to promote Charging Party to the Deputy Real Estate Editor position based on his race and/or sex.

100.    The effect of the practices complained of in Paragraphs 14-99 above has been to deprive Charging Party of equal employment opportunities and otherwise affect his status as an employee because of his race and/or sex.

101.    The unlawful employment practices complained of above were intentional.

102.    The unlawful employment practices complained of above were done with malice or with reckless indifference to Charging Party's federally protected rights.

## PRAYER FOR RELIEF

103.    Wherefore the Commission respectfully requests that this Court:

A.    Grant a permanent injunction enjoining Defendant, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with it, from discriminating against employees because of race or sex;

B.    Order Defendant to institute and carry out policies, practices, and programs which provide equal employment opportunities for individuals regardless of race or sex and which eradicate the effects of its past and present unlawful employment practices;

C.    Order Defendant to make Charging Party whole by providing appropriate backpay with prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices described above;

D.    Order Defendant to make Charging Party whole by providing compensation for any past and future pecuniary losses resulting from the unlawful employment practices described above, in amounts to be determined at trial;

E.    Order Defendant to make Charging Party whole by providing compensation for past and future non-pecuniary losses resulting from the unlawful employment practices described above, including emotional pain, suffering, inconvenience, mental anguish, and other

16

nonpecuniary losses, in amounts to be determined at trial;

F.     Order Defendant to pay Charging Party punitive damages for its malicious and/or reckless conduct in amounts to be determined at trial;

G.     Order Defendant to provide Charging Party appropriate equitable relief in the form of instatement to a Deputy Editor Position and/or an appropriate award of front pay;

H.     Grant such further relief as the Court deems necessary and proper in the public interest; and

I.     Award the Commission its costs of this action.

## JURY TRIAL DEMAND

The Commission requests a jury trial on all questions of fact raised by this Complaint that are triable to a jury.

Dated: May 5, 2026

CATHERINE L. ESCHBACH
Acting General Counsel

CHRISTOPHER LAGE
Deputy General Counsel

/s/*Benjamin North*_____
BENJAMIN NORTH
Assistant General Counsel
(*pro hac vice forthcoming)*

CARL CHANG
Trial Attorney
(*pro hac vice forthcoming*)

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

131 M Street NE
Washington, D.C., 20507