# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, <br> *Plaintiff*, <br><br> - and - <br><br> BRYANT ROUSSEAU, <br> *Proposed Intervenor-Plaintiff*, <br><br> v. <br><br> THE NEW YORK TIMES COMPANY, <br> *Defendant*. | Case No. 1:26-cv-3704-GHW-RFT <br><br> **[PROPOSED] COMPLAINT OF [PROPOSED] INTERVENOR-PLAINTIFF BRYANT ROUSSEAU** <br><br> **JURY TRIAL DEMANDED** <br><br> **Expedited treatment requested, per 42 U.S.C. §2000e-5(f)(5)** |

1.      As a unanimous Supreme Court recently affirmed, our nation's antidiscrimination laws establish "the same protections for every 'individual,'" including those in a "majority group." *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 310 (2025).

2.      The New York Times violated these principles—boldly and badly.

3.      The Times has long decried that its "leadership is … not as diverse as it needs to be" because "[p]eople of color — and particularly women of color — remain notably underrepresented." N.Y. Times, *A Call to Action: Building a Culture That Works for All of Us* (2021), perma.cc/24PB-WV5D (*A Call to Action*). The Times has prioritized filling "gaps in the racial diversity of leadership" and "gaps in promotion … among some colleagues of color." N.Y. Times, *2021 Diversity and Inclusion Report*, perma.cc/9U88-PMF3 (*2021 Report*). The Times even publicly committed to preferenc-

ing black women when filling leadership roles, setting an explicit racial quota to "increas[e] the representation of Black and Latino colleagues in leadership by 50 percent over the next five years." *A Call to Action.* And when the Times hit its quota early, it pledged not to stop there but "to build on this progress." N.Y. Times, *2022 Diversity and Inclusion Report*, perma.cc/DEX6-BVRS (*2022 Report*). As the numbers of racial minorities and women continued to climb, the Times "committed to maintaining [its] momentum" and its "focus" on "continuing to close the gaps between representation at the … leadership leve[l]." N.Y. Times, *2023 Diversity and Inclusion Report*, perma.cc/M8BS-KZFG (*2023 Report*).

4.      Bryant Rousseau has worked as an editor at the Times since 2014. A white male, Rousseau had no path for advancement. When the position of real-estate deputy editor opened, Rousseau was uniquely qualified for the role, with his extensive experience in real-estate and architecture journalism and his exceptional track record as an editorial leader and innovator at the Times. And yet: A significantly less qualified multiracial black woman was hired over him, consistent with the Times's stated goal to increase the representation of black women in leadership roles.

5.      The Times's discrimination violated Title VII, 42 U.S.C. §1981, and New York law. Rousseau is entitled to relief.

**PARTIES**

6.      Plaintiff, the United States Equal Employment Opportunity Commission, is a federal agency charged with the administration, interpretation, and enforcement of

2

Title VII. EEOC is expressly authorized to bring this action under 42 U.S.C. §2000e-5(f)(1).

7.      Intervenor-Plaintiff, Bryant Rousseau, is an employee of the New York Times. The Times discriminated against Rousseau based on race and sex. Rousseau resides in New York, New York. Having filed the charge of discrimination that led to this suit, Rousseau has a statutory right to intervene. *See id.* ("The person … aggrieved shall have the right to intervene in a civil action brought by the Commission … .").

8.      Defendant, The New York Times Company, is a daily newspaper head-quartered in New York, New York. It has more than 5,000 employees.

## JURISDICTION AND VENUE

9.      The Court has subject-matter jurisdiction because this action arises under federal civil-rights laws. 28 U.S.C. §§1331, 1343; *see also* 42 U.S.C. §2000e-5(f)(3).

10.      The Court has supplemental jurisdiction over state- and city-law claims because they form part of the same case or controversy as the federal claims. 28 U.S.C. §1367.

11.      The Court has authority to issue the relief sought under 28 U.S.C. §2201 and §2202; 42 U.S.C. §1981, §1981a, and §2000e-5; N.Y. Exec. Law §296; and N.Y.C. Admin. Code §8-107.

12.      Venue is proper because the Times resides in this district and a substantial part of the events or omissions giving rise to the claims occurred here. 28 U.S.C. §1391; *see also* 42 U.S.C. §2000e-5(f)(3).

## FACTUAL ALLEGATIONS

13.     Bryant Rousseau is an innovative editorial leader with 30 years' experience defining and executing the strategic content vision of highly successful digital and print publications at top media companies, including the New York Times, the Economist, and McGraw-Hill.

14.     Rousseau joined the Times in 2014. He has worked as a senior staff editor at the Times's International Desk since 2016. A significantly less qualified multiracial black woman was hired over him, consistent with the Times's stated goal to increase the representation of black women in leadership.

**Real Estate Deputy Editor**

15.     In April 2025, Rousseau was passed over for the role of deputy editor (the No. 2 editor and a senior leadership role) of the real-estate section for Monica Burton, a multiracial black woman from outside the Times.* *Monica Burton Is Joining Real Estate*, N.Y. Times (Apr. 9, 2025), perma.cc/2475-3JTY.

16.     The real-estate deputy-editor position would have been a significant promotion for Rousseau. Deputy editor is above senior-staff editor and is a "leadership" role in the Times's newsroom. The promotion also would have brought a pay increase.

17.     Nikita Stewart, the No. 1 real-estate editor at the time, was the hiring manager for the real-estate deputy-editor position. Stewart worked with Soraya Gunnell, a

---

\* According to the Times, "Burton self-identifies as 'Two or More Races' in the company's H.R. system." After the Times announced Burton's hiring, a publication dedicated to chronicling diversity in media reported that her "appointment puts Black women in the top two position on th[e] [real estate] desk." Prince, *Short Takes* (Apr. 19, 2025), Journal-isms, perma.cc/N8PK-ZQZK.

senior talent acquisition manager, to fill the opening. Both Stewart and Gunnell are black women.

18.    Stewart and Gunnell are champions of the Times's "diversity, equity, and inclusion" efforts. "[D]iversity, equity, and inclusion" activities were part of Stewart's and Gunnell's 2024 performance reviews.

19.    The job listing for the real-estate deputy-editor position included four "Requirements": "[a]t least 7 years of experience at a digital or daily publication or newsroom"; "[a]t least 5 years of experience editing staff and contributing writers"; "[e]xperience with stories about real estate development, the housing market, as well as decor, design, and architecture"; and "[s]trong, compassionate leadership skills." Rousseau met all four; Burton, the multiracial black woman hired for the job from outside the Times, did not.

20.    Rousseau's experience in real estate, architecture, and design journalism is deep and exceptional. Before joining the Times, Rousseau spent more than seven years leading highly respected magazines dedicated to real-estate development, the housing market, architecture, and design. For more than seven years, real estate, architecture, and design was the sole focus of Rousseau's journalism career.

21.    Rousseau worked one year as executive editor (the No. 2 editor) of Commercial Property News (now Commercial Property Executive), a biweekly magazine dedicated to all aspects of real-estate development. Rousseau oversaw all day-to-day print and web-editorial operations, managing a staff of six editors.

22.    Rousseau next worked more than two years as editor-in-chief of Multi-Housing News, a magazine covering the housing market across all economic spectrums—from luxury, to affordable, to Section 8 housing. Low-income housing was a major focus of the magazine's coverage during Rousseau's tenure. Rousseau conceived several new content products for print, online, and in-person events, earning himself multiple innovation awards from company leadership. Rousseau was regularly invited to speak about real-estate development and the housing market at industry conferences.

23.    Rousseau then worked four years as editorial director (the top editor) of digital media for the architecture, engineering, and construction media division of McGraw-Hill (now S&P Global). Rousseau oversaw all digital content for 17 magazines, including the flagship publication Architectural Record—the bible of American architects and, during his time there, the official publication of the American Institute of Architects.

24.    At McGraw-Hill, almost the entirety of Rousseau's professional life was dedicated to assigning and covering stories about design and architecture. He interviewed many of the world's most famous architects. He traveled the country and the globe, producing videos about architecture in general and housing in particular. Covering affordable housing was an important focus of Rousseau's work. Rousseau spent half a day on a one-on-one tour of the Bronx with then-Secretary of the U.S. Department of Housing and Urban Development Shaun Donovan, discussing HUD's efforts to

help with affordable housing, the agency's plans, and how Secretary Donovan's background as an architect informed his duties at HUD.

25.    Rousseau conceived and implemented dozens of innovative content products, online events, and custom websites at McGraw-Hill. The excellence of his work was recognized at the highest levels. He received the company's "Corporate Achievement" award in recognition of his innovation. He also won dozens of other major journalism awards, including several Jesse H. Neal Awards—the pinnacle of peer recognition in business journalism.

26.    The overlap in coverage between Architectural Record and the Times's real-estate section was so close that some of the freelance writers Rousseau employed at Architectural Record also wrote—and still write—for the Times's real-estate section.

27.    Rousseau's track record also reflected exceptionally strong, compassionate leadership skills, and he is regarded at the Times as an especially effective mentor to journalists just starting out in their careers.

28.    Rousseau has held editorial leadership roles continuously since 1996. For the entirety of the 18 years before he joined the Times, Rousseau managed large staffs of journalists (as many as over a dozen) with diverse levels of skills and experiences. In addition to his roles at Commercial Property News, Multi-Housing News, and McGraw-Hill, immediately before joining the Times Rousseau was the editorial director of content and programming for conferences in the Americas at The Economist, where he managed four journalists. At the Times, Rousseau worked for more than two years

as the international weekend editor, overseeing the paper's global weekend coverage and directing well over 50 journalists to report on some of the world's most important news stories. For the last six years, Rousseau has overseen, or been co-lead of, some of the Times's most important, most popular, and most innovative franchises, including "Dispatches," "The Global Profile," "What in the World," "Promises Made," and "The Global News Quiz."

29.    Rousseau's annual performance reviews at the Times have all been stellar. In 2024, his manager described him as "superb" and "a linchpin of our desk," emphasized his role in publishing "the best and most-read profiles and dispatches we produced," and applauded, among other things, his "special interest in nurturing our less-experienced writers, lifting their copy and helping them get better." In 2023, his manager praised his "versatility as an editor," describing him as "one of our strongest news editors" and "a team player" and applauding his "dedication in helping our younger reporters" and "the enormous effort it takes." In 2022, his manager described him as "such a vital part of the desk," "consistently mak[ing] significant contributions," and a "team player" for taking on additional responsibilities. In 2021, his manager praised him as a "talented editor" who is "'extremely conscientious' about [his] work, ready to help, attentive to detail and 'a pleasure to work with'" because he "treat[s] [his] colleagues with respect, an enormous help in setting the right tone for all." Prior performance reviews reflect similar praise.

30.     Rousseau applied for the real-estate deputy-editor position through the Times's internal job portal on January 9, 2025. Upon submitting his application, Rousseau emailed Stewart and Gunnell about his application with a copy of his resume. Rousseau emphasized his "deep editing experience in (and personal passion for) real estate and design," highlighting his relevant experiences in real-estate journalism. Stewart responded the next day and scheduled an interview.

31.     Rousseau interviewed with Stewart in person on January 13. In his interview, Stewart expressed that Rousseau's experience covering real estate and the housing market, particularly affordable housing, was what she wanted for the role. They had a robust conversation about New York City's housing affordability crisis and how the Times's real-estate section could feature more lower-income people. Stewart also expressed admiration for Rousseau's proven abilities as an editorial leader and manager, especially his experience mentoring younger journalists. Stewart told Rousseau that he would be given the opportunity to present a written vision for the real-estate desk and the deputy-editor role at the next stage in the process.

32.     Rousseau interviewed with Gunnell by video conference on February 10. Gunnell likewise told Rousseau that he would be given an opportunity to discuss his vision for the role at the next stage in the process.

33.     But Stewart and Gunnell did not advance Rousseau to the next stage because he is a white male. None of the four candidates given a final panel interview for the real-estate deputy-editor position was a white man. The group of final candidates

9

was composed of a white woman, a black man, an Asian woman, and a multiracial black woman (Burton)—each matching the race or sex characteristics that the Time sought to increase in its leadership.

34. Burton was among the two lowest rated candidates out of the four finalists. One final panel interviewer ranked her tied for lowest of the four finalists, describing her as "a bit green overall" and concluding, "I don't see her contributing to the expansion of the coverage in a significant way."

35. Unlike Rousseau, Burton did not satisfy the job listing's "requirements." She had no professional experience with stories about real-estate development, the housing market, decor, design, or architecture. She spent seven years, most of her entire professional journalism career, at Eater, which covers one topic: food. And she had at most only four years of editorial leadership experience, compared to Rousseau's twenty. But as a multiracial black woman, Burton advanced the Times's race- and sex-based hiring goals for leadership positions.

36. On April 9, 2025, the Times announced the hiring of Burton.

37. Under any fair, neutral assessment, Rousseau was the dream candidate to fill the role of real-estate deputy editor. But he was not given the job because he is a white male. Instead, the Times hired a multiracial black woman with no experience in one of the supposed job requirements and vastly less experience than Rousseau in all the others.

10

**The Times's Systemic Discrimination**

38.     Rousseau's experience, being passed over for promotions for less qualified black women, is part of a pattern of systemic discrimination at the Times aimed to "achiev[e] greater diversity." *A Call to Action*, perma.cc/24PB-WV5D.

39.     Over the last decade, the Times has openly voiced its desire to hire and promote more racial minorities and women because of their race and sex, particularly for "leadership" roles—defined as deputy editor and above in news and opinion departments.

40.     Since 2017, the Times has published an annual "Diversity and Inclusion Report" with "detailed data about the ethnic and gender composition of [its] staff." N.Y. Times, *2017 Diversity and Inclusion Report*, perma.cc/NP5J-J9CB (*2017 Report*).

41.     The 2017 report noted that the Times is "increasingly focused on how to foster diversity and inclusion within our own company." *Id.* It decried that "[j]ournalism as an industry has long been disproportionately white and male." *Id.* The report explained that the Times's numbers of female and racial minority staff members and leadership were "moving in the right direction — though not far enough or fast enough." *Id.* "[I]mproving that trajectory," the report explained, "is a focus for us." *Id.* To "make [the Times] accountable to the public," the company "[c]omitt[ed] to publishing an annual report" and "instituting new ways to share data and insights internally, so managers know where their teams stand and can be held accountable for progress." *Id.*

11

42.     The 2018 report explained that "[t]he numbers show a general trend toward greater diversity, though not across the board." N.Y. Times, *2018 Diversity and Inclusion Report*, perma.cc/YX7K-7R7U. The report boasted "significant" "progress on gender equality," though it bemoaned that racial diversity in leadership remained stagnant. *Id.* The report described various "programs aimed at creating a diverse … workplace," including "hosting the Student Journalism Institute for aspiring journalists of color." *Id.*

43.     The 2019 report reaffirmed the Times's "commit[ment] to fostering a diverse staff." N.Y. Times, *2019 Diversity and Inclusion Report*, perma.cc/6MSZ-PJD5. The numbers that year showed "staff [wa]s steadily becoming more diverse across gender, race and ethnicity … driven in part by the diversity of our new hires." *Id.* But there remained "gaps in representation at the leadership level, particularly of people of color." *Id.* The report stressed the "importan[ce]" of "accelerating progress here." *Id.*

44.     The Times then published "A Call to Action" with "a bold plan for building a more diverse, equitable and inclusive New York Times." *A Call to Action*, perma.cc/24PB-WV5D. The call noted that recent efforts "led to significant progress in diversifying the company." *Id.* "Last year, 48 percent of new hires were people of color." *Id.* And since 2015, the Times "increased the overall percentage of people of color at the company from 27 percent to 34 percent"; "increased the percentage of people of color in leadership from 17 percent to 23 percent"; "increased the percentage

of women at the company from 45 percent to 52 percent"; and "increased the percentage of women in company leadership from 40 percent to 52 percent." *Id.*

45.    The call to action, however, lamented that "progress in diversifying the company" was "incomplete." *Id.* Company "leadership [wa]s still not as diverse as it needs to be." *Id.* Specifically, "[p]eople of color — and particularly women of color — remain notably underrepresented in leadership." *Id.* So the Times "set a goal of increasing the representation of Black and Latino colleagues in leadership by 50 percent by 2025." *Id.* This "clear and ambitious target," the call explained, "is a way to hold ourselves accountable for people of color advancing through our organization." *Id.* And for those who "may question" why the Times "set a goal for representation specifically for Black and Latino colleagues in leadership," the Times answered: "it's where we have the biggest representation gaps." *Id.*

46.    The 2020 report revealed "progress" with staff "becoming steadily more diverse in terms of gender, race and ethnicity." N.Y. Times, *2020 Diversity and Inclusion Report*, perma.cc/SU5B-F6KC. It boasted that "[n]early half of colleagues who joined the company last year were people of color." *Id.* But there remained "gaps, particularly in representation of people of color in leadership." *Id.* These gaps "underscor[ed] why [the Times] set a goal to double the share of Black/African American and Latino/Hispanic colleagues in leadership by 2025." *Id.*

47.    In its 2021 report, the Times "saw the largest increase in representation of people of color since [it] started reporting this data." *2021 Report*, perma.cc/9U88-

PMF3. That company-wide increase included "leadership," where "the representation of people of color … grew from 23 percent to 27 percent." *Id.* Yet there remained "areas that need additional attention," specifically "gaps in the racial diversity of leadership" and "gaps in promotion … among some colleagues of color." *Id.*

48. The 2022 report boasted that the Times had "met [its] goal to increase representation of Black colleagues in leadership by 50 percent." *2022 Report*, perma.cc/DEX6-BVRS. But the Times would not stop there: "We intend to build on this progress" and "are committed to continuing this work," the report pledged. *Id.*

49. The 2023 report characterized further increases in the number of racial minorities and women as "significant progress." *2023 Report*, perma.cc/M8BS-KZFG. But the report emphasized that the Times must "maintain [its] focus" on "continuing to close the gaps between representation at the … leadership leve[l]." *Id.* "We are proud of the significant progress we have made on all these fronts in recent years and we remain committed to maintaining our momentum." *Id.*

50. The 2024 report, published mid-2025, marked a shift in the Times's reports. Unlike each prior year, the 2024 report published its data without any analysis or commentary on how the data reflected the Times's stated diversity goals. N.Y. Times, *2024 Diversity and Inclusion Report*, perma.cc/7LXR-QX5K (*2024 Report*).

51. Months earlier, President Trump issued an executive order explaining that "major corporations … have adopted and actively use dangerous, demeaning, and immoral race- and sex-based preferences under the guise of so-called 'diversity, equity,

14

and inclusion' … that can violate the civil-rights laws of this Nation." Exec. Order No. 14,173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8,633, 8,633 (2025). President Trump ordered "all agencies to enforce our longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities." *Id.* Weeks later, the Times reported "three main responses emerging in corporate America: retreating, quietly sticking with it[,] and standing up for it." Goldberg, *How Companies Are Navigating the D.E.I. Backlash*, N.Y. Times (Feb. 10, 2025), archive.ph/bTRam. The Times's shift in its 2024 report reflects the second path.

52.    The Times's employee demographic data from 2015 to 2024 shows marked increases in racial minorities and women and corresponding decreases in whites and men for both all staff and leadership. The decreases in whites and men were necessary for the Times to achieve its desired results.

53.    As to race, white staff decreased from 73% to 60%, while minority staff increased from 27% to 37%. *2024 Report*, perma.cc/7LXR-QX5K. And white leadership decreased from 83% to 68%, while minority leadership increased from 17% to 29%. *Id.*



54.     As to sex, male staff decreased from 55% to 45%, while female staff in-creased from 45% to 54%. *Id.* And male leadership decreased from 60% to 44%, while female leadership increased from 40% to 56%. *Id.*



55.     The Times's data shows similar race-based and sex-based trends from 2015 to 2024 for news-and-opinion employees specifically.

56.     As to race, white news-and-opinion staff decreased from 78% to 66%, while minority news-and-opinion staff increased from 22% to 31%. *Id.* And white news-and-opinion leadership decreased from 81% to 68%, while minority news-and-opinion leadership increased from 19% to 29%. *Id.*



57.     As to sex, male news-and-opinion staff decreased from 57% to 46%, while female news-and-opinion staff increased from 43% to 54%. *Id.* And male news-and-opinion leadership decreased from 62% to 44%, while female news-and-opinion leadership increased from 38% to 56%. *Id.*

17



58.    The Times's employee demographic data from 2015 to 2024 clearly shows implementation and execution of the Times's stated preferences for hiring racial minorities and women over whites and men, all under the guise of "foster[ing] diversity." *2017 Report*, perma.cc/NP5J-J9CB.

\*        \*        \*

59.    The Times's demographic data and corresponding statements expressing a preference for hiring and promoting black women, particularly for leadership roles, confirms the race-based and sex-based discrimination that Rousseau experienced.

60.    The Times's "Call to Action" specifically defined "leadership" as "deputy and above in the newsroom." And the Times defined "leadership" as "deputy editor and above" in every diversity and inclusion report from 2017 to today.

61. The Times's desire to increase the number of racial minorities and women in leadership influenced the decision not to promote Rousseau. As a white male, Rousseau did not match the race and sex characteristics that the Times sought to increase in its leadership. But Burton, as a multiracial black woman, did, despite the gaping disparity in qualifications.

## CLAIMS FOR RELIEF
## COUNT I
### Violation of Title VII of the Civil Rights Act of 1964
### 42 U.S.C. §2000e-2 (Race)

62. Rousseau repeats and realleges each of the prior allegations.

63. Title VII makes it illegal "for an employer to fail or refuse to hire … or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] color." 42 U.S.C. §2000e-2(a)(1).

64. Title VII prohibits employers from acting on any "[d]iscriminatory preferences for any group, minority or majority." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973). The law "draws no distinctions between majority-group plaintiffs and minority-group plaintiffs." *Ames*, 605 U.S. at 309.

65. The Times violated Title VII by discriminating against Rousseau in declining to promote him to the role of real-estate deputy editor because of his race.

66. Rousseau "was rejected under circumstances which give rise to an inference of unlawful discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Rousseau satisfied the "basic eligibility for the position at issue." *Slattery v. Swiss*

19

*Reinsurance Am.*, 248 F.3d 87, 92 (2d Cir. 2001). Yet the Times hired a significantly less qualified multiracial black person over Rousseau. *See, e.g.*, *Okor v. Borough of Manhattan Cmty. Coll.*, 2015 WL 3750630, at *4 (S.D.N.Y. June 16). The Times's publicly stated preference for hiring and promoting black employees, particularly for leadership roles, in its various diversity reports further reflects discriminatory purpose. *E.g.*, *Santiago v. ACACIA Network*, 634 F. Supp. 3d 143, 152-53 (S.D.N.Y. 2022).

67.    The Times's racial discrimination against Rousseau was intentional.

68.    The Times's conduct was recklessly and callously indifferent to Rousseau's federally protected rights. *Zimmermann v. Assocs. First Cap.*, 251 F.3d 376, 384 (2d Cir. 2001).

69.    The Times has no valid defense for its use of race in making employment or promotion decisions, either asserted or theoretical.

70.    Rousseau suffered immense damages as a result of the Times's intentional discrimination.

## COUNT II
### Violation of Title VII of the Civil Rights Act of 1964
### 42 U.S.C. §2000e-2 (Sex)

71.    Rousseau repeats and realleges each of the prior allegations.

72.    Title VII makes it illegal "for an employer to fail or refuse to hire … or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex." 42 U.S.C. §2000e-2(a)(1).

20

73.    Title VII prohibits employers from acting on any "[d]iscriminatory preferences for any group, minority or majority." *McDonnell Douglas*, 411 U.S. at 800. The law "draws no distinctions between majority-group plaintiffs and minority-group plaintiffs." *Ames*, 605 U.S. at 309.

74.    The Times violated Title VII by discriminating against Rousseau in declining to promote him to the role of real-estate deputy editor because of his sex.

75.    Rousseau "was rejected under circumstances which give rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253. Rousseau satisfied the "basic eligibility for the position at issue." *Slattery*, 248 F.3d at 92. Yet the Times hired a significantly less qualified woman over Rousseau. *See, e.g.*, *Okor*, 2015 WL 3750630, at *4. The Times's publicly stated preference for hiring and promoting women, particularly for leadership roles, in its various diversity reports further reflects discriminatory purpose. *E.g.*, *Santiago*, 634 F. Supp. 3d at 152-53.

76.    The Times's sex discrimination against Rousseau was intentional.

77.    The Times's conduct was recklessly and callously indifferent to Rousseau's federally protected rights. *Zimmermann*, 251 F.3d at 384.

78.    The Times has no valid defense for its use of sex in making employment or promotion decisions, either asserted or theoretical.

79.    Rousseau suffered immense damages as a result of the Times's intentional discrimination.

## COUNT III
### Violation of the Civil Rights Act of 1866
### 42 U.S.C. §1981

80.    Rousseau repeats and realleges each of the prior allegations.

81.    Section 1981 states that "[a]ll persons … shall have the same right … to make and enforce contracts … and to the full and equal benefit of all laws … as is enjoyed by white citizens." 42 U.S.C. §1981(a). The rights protected by §1981 are protected against impairment by "nongovernmental discrimination." §1981(c).

82.    Section 1981 "protects the equal right of all persons … to make and enforce contracts without respect to race." *Domino's Pizza v. McDonald*, 546 U.S. 470, 474 (2006) (cleaned up). Its "broad terms" bar discrimination "against, or in favor of, any race." *McDonald v. Santa Fe Trail Transp.*, 427 U.S. 273, 295 (1976).

83.    Section 1981 authorizes both equitable and legal relief, including compensatory and punitive damages. *Johnson v. Ry. Express Agency*, 421 U.S. 454, 459-60 (1975).

84.    The Times violated §1981 by discriminating against Rousseau in declining to promote him to the role of real-estate deputy editor because of his race.

85.    The Times's not promoting Rousseau for the role of real-estate deputy editor implicated the "making … of contracts," §1981(b), as the promotion would have created a "new and distinct relation" between Rousseau and the Times, *Butts v. N.Y.C. Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1411-12 (2d Cir. 1993).

86.    Rousseau "was rejected under circumstances which give rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253. Rousseau satisfied the "basic

22

eligibility for the position at issue." *Slattery*, 248 F.3d at 92. Yet the Times hired a significantly less qualified multiracial black person over Rousseau. *See, e.g.*, *Okor*, 2015 WL 3750630, at *4. The Times's publicly stated preference for hiring and promoting black employees, particularly for leadership roles, in its various diversity reports further reflects discriminatory purpose. *E.g.*, *Santiago*, 634 F. Supp. 3d at 152-53.

87.   The Times's racial discrimination against Rousseau was intentional.

88.   The Times's conduct was recklessly and callously indifferent to Rousseau's federally protected rights. *Tolbert v. Queens Coll.*, 242 F.3d 58, 77 (2d Cir. 2001).

89.   The Times has no valid defense for its use of race in making employment or promotion decisions, either asserted or theoretical. Nor could the Times's use of race survive strict scrutiny.

90.   Rousseau suffered immense damages as a result of the Times's intentional discrimination.

## COUNT IV
### Violation of New York State Human Rights Law
### N.Y. Exec. Law §296 (Race)

91.   Rousseau repeats and realleges each of the prior allegations.

92.   New York makes it "an unlawful discriminatory practice" for "an employer" to "refuse to hire or employ" or to otherwise discriminate "in terms, conditions or privileges of employment" because of an individual's "race" or "color." N.Y. Exec. Law §296(1)(a).

93.     The Times violated state law by discriminating against Rousseau in declining to promote him to the role of real-estate deputy editor because of his race.

94.     Rousseau "was rejected under circumstances which give rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253. Rousseau satisfied the "basic eligibility for the position at issue." *Slattery*, 248 F.3d at 92. Yet the Times hired a significantly less qualified multiracial black person over Rousseau. *See, e.g.*, *Okor*, 2015 WL 3750630, at *4. The Times's publicly stated preference for hiring and promoting black employees, particularly for leadership roles, in its various diversity reports further reflects discriminatory purpose. *E.g.*, *Santiago*, 634 F. Supp. 3d at 152-53.

95.     The Times's race discrimination against Rousseau was intentional.

96.     The Times has no valid defense for its use of race in making employment or promotion decisions, either asserted or theoretical.

97.     Rousseau suffered immense damages as a result of the Times's intentional discrimination.

### COUNT V
### Violation of New York State Human Rights Law
### N.Y. Exec. Law §296 (Sex)

98.     Rousseau repeats and realleges each of the prior allegations.

99.     New York makes it "an unlawful discriminatory practice" for "an employer" to "refuse to hire or employ" or to otherwise discriminate "in terms, conditions or privileges of employment" because of an individual's "sex." N.Y. Exec. Law §296(1)(a).

100. The Times violated state law by discriminating against Rousseau in declining to promote him to the role of real-estate deputy editor because of his sex.

101. Rousseau "was rejected under circumstances which give rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253. Rousseau satisfied the "basic eligibility for the position at issue." *Slattery*, 248 F.3d at 92. Yet the Times hired a significantly less qualified woman over Rousseau. *See, e.g.*, *Okor*, 2015 WL 3750630, at *4. The Times's publicly stated preference for hiring and promoting women, particularly for leadership roles, in its various diversity reports further reflects discriminatory purpose. *E.g.*, *Santiago*, 634 F. Supp. 3d at 152-53.

102. The Times's sex discrimination against Rousseau was intentional.

103. The Times has no valid defense for its use of sex in making employment or promotion decisions, either asserted or theoretical.

104. Rousseau suffered immense damages as a result of the Times's intentional discrimination.

## COUNT VI
### Violation of New York City Human Rights Law
### N.Y.C. Admin. Code §8-107(1) (Race)

105. Rousseau repeats and realleges each of the prior allegations.

106. New York City makes it "an unlawful discriminatory practice" for "an employer" to "refuse to hire or employ" a person or to otherwise discriminate against a person "in terms, conditions or privileges of employment" because of an individual's "race" or "color." N.Y.C. Admin. Code §8-107(1)(a)(2)-(3).

107.   The Times violated city law by discriminating against Rousseau in declining to promote him to the role of real-estate deputy editor because of his race.

108.   Rousseau "was rejected under circumstances which give rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253. Rousseau satisfied the "basic eligibility for the position at issue." *Slattery*, 248 F.3d at 92. Yet the Times hired a significantly less qualified multiracial black person over Rousseau. *See, e.g.*, *Okor*, 2015 WL 3750630, at *4. The Times's publicly stated preference for hiring and promoting black employees, particularly for leadership roles, in its various diversity reports further reflects discriminatory purpose. *E.g.*, *Santiago*, 634 F. Supp. 3d at 152-53.

109.   The Times's race discrimination against Rousseau was intentional.

110.   The Times's conduct consciously disregarded Rousseau's rights. *Chauca v. Abraham*, 30 N.Y.3d 325, 334 (2017); *Tolbert*, 242 F.3d at 77.

111.   The Times has no valid defense for its use of race in making employment or promotion decisions, either asserted or theoretical.

112.   Rousseau suffered immense damages as a result of the Times's intentional discrimination.

## COUNT VII
### Violation of New York City Human Rights Law
### N.Y.C. Admin. Code §8-107(1) (Sex)

113.   Rousseau repeats and realleges each of the prior allegations.

114.   New York City makes it "an unlawful discriminatory practice" for "an employer" to "refuse to hire or employ" a person or to otherwise discriminate against

a person "in terms, conditions or privileges of employment" because of an individual's "sex." N.Y.C. Admin. Code §8-107(1)(a)(2)-(3).

115. The Times violated city law by discriminating against Rousseau in declining to promote him to the role of real-estate deputy editor because of his sex.

116. Rousseau "was rejected under circumstances which give rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253. Rousseau satisfied the "basic eligibility for the position at issue." *Slattery*, 248 F.3d at 92. Yet the Times hired a significantly less qualified woman over Rousseau. *See, e.g.*, *Okor*, 2015 WL 3750630, at *4. The Times's publicly stated preference for hiring and promoting women, particularly for leadership roles, in its various diversity reports further reflects discriminatory purpose. *E.g.*, *Santiago*, 634 F. Supp. 3d at 152-53.

117. The Times's sex discrimination against Rousseau was intentional.

118. The Times's conduct consciously disregarded Rousseau's rights. *Chauca*, 30 N.Y.3d at 334; *Tolbert*, 242 F.3d at 77.

119. The Times has no valid defense for its use of sex in making employment or promotion decisions, either asserted or theoretical.

120. Rousseau suffered immense damages as a result of the Times's intentional discrimination.

## PRAYER FOR RELIEF

121. Rousseau respectfully asks this Court to enter judgment in his favor and against the Times and to provide the following relief:

27

A.  Compensatory damages;

B.  Punitive damages;

C.  Nominal damages;

D.  Reasonable costs and expenses of this action, including attorney fees, under 42 U.S.C. §1988 and any other applicable laws;

E.  All other relief that the EEOC seeks or is entitled to; and

F.  All other relief that Rousseau is entitled to.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Rousseau demands a trial by jury of all issues so triable.


Dated: May 15, 2026                              Respectfully submitted,

                                                 */s/ Daniel M. Vitagliano*
                                                 Cameron T. Norris*
                                                 Daniel M. Vitagliano[†]
                                                     SDNY Bar No. 5856703
                                                 CONSOVOY MCCARTHY PLLC
                                                 1600 Wilson Blvd., Ste. 700
                                                 Arlington, VA 22209
                                                 703-243-9423
                                                 cam@consovoymccarthy.com
                                                 dvitagliano@consovoymccarthy.com

                                                 *Counsel for Bryant Rousseau*

                                                 * Pro hac vice application forthcoming
                                                 [†] Supervised by principals of the firm
                                                 admitted to practice in VA

28